IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

BARBARA NORRIS,

Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,

Defendant.

CASE NO. 1:25-CV-00738-DAC

MAGISTRATE JUDGE DARRELL A. CLAY

**MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

Plaintiff Barbara Norris challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1) The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Apr. 14, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #9). For the reasons below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Norris applied for DIB and SSI in August 2022, alleging she became disabled on April 21, 2017. (Tr. 95-96, 294). She later amended her alleged onset date to April 28, 2022. (Tr. 37). After the claims were denied initially and on reconsideration, Ms. Norris requested a hearing before an Administrative Law Judge. (Tr. 97-108, 111-24, 159-60). In April 2024, Ms. Norris (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 35-57). In May 2024, the ALJ determined Ms. Norris was not disabled. (Tr. 14-32). The Appeals Council denied

1

her request for review of the ALJ's decision, so the decision is the Commissioner's final decision.

(Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Ms. Norris timely filed this action. (ECF #1).

FACTUAL BACKGROUND

### I.      Personal and Vocational Evidence

Ms. Norris was 51 years old on her amended alleged onset date and 53 years old at the

administrative hearing. (*See* Tr. 97). She completed 11th grade and has worked as a hotel cleaner.

(Tr. 310).

### II.     Medical Evidence

Ms. Norris has a history of vertigo, peripheral vestibulopathy of the right ear, and lower-

back pain. (Tr. 402-03, 411-12). Her vertigo began in March 2017 and occurs one-to-two times a

week. (Tr. 403, 412). A 2017 x-ray of her lumbar spine showed "partial sacralization of L5" with

narrowing of the L5-S1 disc space and degenerative facet arthropathy from L4-S1. (Tr. 414).

In May 2021, Ms. Norris met with an internal medicine physician to establish care and

reported frequent vertigo and lower-back pain. (Tr. 411). She was taking meclizine for vertigo and

ibuprofen and Tylenol for pain. (Tr. 412). Her lower back was tender to palpation and she walked

with an antalgic gait, but her examination was otherwise normal. (Tr. 413-14). The provider

referred her to a physical medicine and rehabilitation (PM&R) program for evaluation. (Tr. 415).

Ms. Norris continued to report having two episodes of vertigo a week. (Tr. 420). In August

2021, her internist directed her to an otolaryngologist (ENT) for evaluation and treatment. (Tr.

423). She met with ENT specialist Robert Stegmoyer, M.D., in April 2022 and reported dizziness

and vertigo with buzzing and pressure in her left ear that lasts from several minutes to several

hours. (Tr. 432). Her neurological examination was unremarkable, with normal motor and sensory

2

testing, steady gait, and negative Romberg and Dix-Hallpike testing. (Tr. 434). Her audiology tests showed low-frequency hearing loss in her right ear. (Tr. 435). Dr. Stegmoyer assessed Meniere's disease and asymmetrical hearing loss.[1] (Tr. 436). Electrocochleography testing was normal, without electrophysiologic evidence of increased pressure. (Tr. 452). An MRI of her head was unremarkable. (Tr. 466).

In August 2022, Ms. Norris reported ongoing back pain and vertigo. (Tr. 457). Except for bilateral lumbar paraspinal tenderness, her physical examination was normal. (Tr. 458). Her provider refilled her prescriptions for meclizine and ibuprofen, directed her to follow up with Dr. Stegmoyer, and referred her to the PM&R program. (Tr. 459).

In November 2022, Ms. Norris met with Raafey Syed, M.D., of the PM&R program and reported chronic lower-back pain, left greater than right, and left lateral leg pain in her mid-thigh. (Tr. 565). Her pain worsened with sitting, bending, and prolonged walking. (*Id.*). On examination, Dr. Syed noted positive facet loading and left lumbar paraspinal tenderness, mild weakness in the legs with "some component of give-away due to pain." (Tr. 566-67). Dr. Syed ordered an MRI and referred her to physical therapy. (Tr. 567).

During a routine follow-up visit with her internist in December 2022, Ms. Norris reported ongoing back pain. (Tr. 577). Her physical examination was normal except she had bilateral lumbar paraspinal tenderness. (Tr. 578). The doctor refilled her ibuprofen prescription . (Tr. 579).

---

[1]     Meniere's disease is an inner ear condition that causes dizziness (vertigo) and hearing loss, ranging from mild to severe. The most common symptoms are pressure or fullness and ringing in the ear, dizziness, and difficulty hearing. The symptoms come and go, lasting for hours or days at a time. The most common treatment is meclizine. (Tr. 438).

An MRI of Ms. Norris's lumbar spine taken in February 2023 showed grade I degenerative spondylolisthesis and advanced facet arthropathy at L3-L4 and L4-L5, mild left neural foraminal stenosis and mild disc desiccation at L4-L5, and mild left neural foraminal stenosis at L5-S1 with "mass effect on left L5 nerve related to the partially sacralized L5 and associated osteophytes." (Tr. 608).

Ms. Norris was still having back pain and symptoms of vertigo in March 2023. (Tr. 622). Her provider refilled prescriptions for meclizine, ibuprofen, Tylenol, and lidocaine patches and directed her to follow up with Dr. Syed for back pain and Dr. Stegmoyer for vertigo. (Tr. 624-25).

In April 2023, Ms. Norris reported less lateral thigh pain but ongoing left lower-back pain and recent left groin and proximal thigh pain that was worse with walking. (Tr. 682). Ms. Norris endorsed left groin pain with Stinchfield, FABER, and FADIR testing (each to identify the cause of her pain) and Dr. Syed noted global non-localizing weakness in all extremities. (Tr. 683). He ordered hip x-rays to evaluate her groin pain. (Tr. 684).

Ms. Norris met with Dr. Syed again in May 2023 and reported ongoing left lower-back and groin pain. (Tr. 679). She had not yet started physical therapy. (*Id.*). On physical examination, she had global diffuse non-localizing weakness in her upper and lower extremities. (Tr. 680). Dr. Syed felt her weakness was likely "functional and/or related to global deconditioning" because there were "no significant findings" in the MRI that "would explain diffuse [bilateral lower extremity] weakness." (Tr. 681). He encouraged Ms. Norris to schedule physical therapy. (*Id.*).

In November 2023, she reported lower-back pain and left lateral leg pain. (Tr. 808). Dr. Syed again referred her for physical therapy. (Tr. 810).

III.     Opinion Evidence

In December 2022, state agency medical consultant Venkatachala Sreenivas, M.D., opined Ms. Norris can lift and carry 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for six hours each in an eight-hour workday; frequently climb ramps and stairs, balance, stoop, and crouch; occasionally crawl; never climb ladders, ropes, or scaffolds; and must avoid all exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 98-101). In support, Dr. Sreenivas cited her vertigo and back pain. (Tr. 100).

In March 2023, state agency medical consultant Gail Mutchler, M.D., reviewed updated medical records and agreed with most of Dr. Sreenivas's conclusions but additionally determined Ms. Norris can frequently kneel and crawl, occasionally stoop, and must avoid concentrated exposure to noise and vibration to avoid triggering vertigo. (Tr. 113-15).

IV.     Testimonial Evidence

Ms. Norris testified she has vertigo ("I'm off balance") that comes and goes unexpectedly, typically three times a week. (Tr. 41-44). She takes meclizine at the onset of an episode. (Tr. 44). An episode can occur at any time, lasts ten or fifteen minutes, and is associated with shortness of breath, vision loss, and a racing heartrate. (Tr. 44, 47). She sometimes needs help getting to the bathroom and finds it challenging to take a shower and wash her hair. (Tr. 42-43). She also has some hearing loss and sometimes needs to ask people to repeat what they say but has no trouble using the phone. (Tr. 44-45; *see also* Tr. 35 (noting the hearing was by telephone)).

Ms. Norris's back pain is "terrible." (Tr. 45). She cannot do much lifting or bending over and gets shooting pains from her back to her legs when she walks. (Tr. 45-46). She has some associated leg weakness that makes her legs feel shaky. (Tr. 46). Standing in one spot or sitting for

5

too long is painful. (Tr. 48). She uses pain-relief patches, Biofreeze, and BenGay and takes pain medication with some relief. (Tr. 45-46, 49). She stretches, exercises, and sits with pillows behind her back for extra support. (Tr. 49-50).

Ms. Norris has good days and bad days, but more often bad. (*See* Tr. 51) ("There's 30 days in one month. Maybe I have a good week or two"). On a good day, she gets up, watches the news, eats, and naps. (Tr. 46, 50). She washes dishes but her boyfriend does most of the cooking. (Tr. 47). Ms. Norris also does laundry, using a rolling cart instead of baskets to move piles of clothes. (Tr. 48). She can sit for a half-hour and stand for one hour before she must change positions and can walk for about a half-hour around the grocery store when she can lean on a cart. (Tr. 48-49). On bad days, she stays in bed "mostly all day." (Tr. 51).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Norris had not engaged in any substantial gainful activity since April 28, 2022, the amended alleged onset date. (Tr. 21). At Step Two, the ALJ identified three severe impairments: (1) peripheral vestibulopathy (Meniere's disease), (2) lumbar degenerative disc disease, and (3) hearing loss in the right ear. (*Id.*). At Step Three, the ALJ found Ms. Norris's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 22). At Step Four, the ALJ determined Ms. Norris's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. She is capable of occasional balancing as well as occasional stooping. She can frequently kneel and crouch, but only occasionally crawl. She would need to avoid exposure to more than moderate noise (*i.e.*, more than a three on the five-point scale as per the Dictionary of Occupational Titles) and would also need to avoid excessive vibration.

(Tr. 22) (cleaned up). The ALJ found Ms. Norris can perform her past relevant work as a housekeeper/cleaner and thus concluded she was not disabled. (Tr. 25, 27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a

8

"zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Ms. Norris raises one issue for consideration: whether the ALJ erred when he "failed to provide a logical bridge between the medical evidence and [her] [RFC] to perform light work activity."[2] (ECF #12 at PageID 848). She asserts "the medical evidence does not support a finding that [she] would be able to perform the requirements of light work activity" and contends the

---

[2]     Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

9

combination of her imbalance from vertigo and her low back and groin pain prevent her from meeting the standing and walking requirements for light work. (*Id.* at PageID 858).

A claimant's RFC represents the most a claimant can still do despite the physical and mental limitations resulting from the claimant's impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ alone determines a claimant's RFC. *Id.* §§ 404.1546(c), 416.946(c). The RFC must be based on all relevant record evidence, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* §§ 404.1545(a), 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-CV-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.,* laboratory findings) and nonmedical evidence (*e.g.,* daily activities, observations)." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (July 2, 1996). In short, the ALJ must connect the dots between the evidence and the ALJ's conclusion.

When the claimant alleges her symptoms, like pain, prevent her from working, the ALJ's decision must (1) contain a discussion and analysis of the objective medical and other evidence; (2) include the ALJ's resolution of any inconsistencies with the evidence as a whole; and (3) provide a logical explanation of the effects of the symptoms on the claimant's ability to work. *Id.* In that discussion, the ALJ must explain why a claimant's reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. *Id.* The ALJ must also consider and address any medical source opinions within the record. *Id.*

10

Ms. Norris alleges she cannot work because she has vertigo with imbalance and back pain that, in combination, prevent her from performing the standing and walking requirements of light work. (ECF #12 at PageID 858-89). The ALJ reviewed medical evidence relevant to her complaints of vertigo, specifically her appointment with Dr. Stegmoyer in April 2022, a head MRI in October 2022, and an appointment with her primary care physician in March 2023. (Tr. 24). In his review, the ALJ acknowledged Ms. Norris has Meniere's disease and associated vertigo, but explained that her otolaryngology examination was normal, with intact finger-to-nose coordination, normal sensory and motor function, steady gait, negative provocation testing, and meclizine provided symptom relief. (*Id.*).

The ALJ then reviewed medical evidence relevant to Ms. Norris's back pain, including imaging showing degenerative facet arthropathy, low-grade spondylolisthesis, a partially sacralized L5 with associated osteophytes creating a mass effect (compression or displacement) on the left L5 nerve root, and no significant osteoarthritis in the hip. (Tr. 24). In addition to the imaging, the ALJ acknowledged Ms. Norris endorsed pain with lumbar facet-loading maneuvers, had left lumbar paraspinal tenderness, absent Achilles' reflexes, and mild diffuse generalized weakness in all extremities with "some component of give-away [weakness] due to pain." (*Id.*). The ALJ also took note of her otherwise normal physical examinations, including intact sensation without neurological sensory or focal deficits, and non-antalgic gait. (*Id.*). As to both impairments, the ALJ emphasized the routine and conservative nature of treatment, including meclizine for vertigo and topical creams, ibuprofen, and Tylenol for back pain. (*Id.*).

The ALJ then discussed how Ms. Norris's reportedly disabling symptoms were inconsistent with the record, pointing out that her treatment has been routine and conservative in nature and

her physical examinations were largely unremarkable, with some low-back tenderness, mild unexplained generalized weakness, and absent Achilles' reflexes. (Tr. 25). In that analysis, the ALJ also determined Ms. Norris "received limited treatment for allegedly disabling conditions." (*Id.*). These are proper considerations:

> Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

> In contrast, if the frequency of extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.

SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). As the ALJ recognized, while Ms. Norris complained of vertigo after establishing care with Dr. Stegmoyer, she did not follow up for further treatment, as her primary care physician directed. (*See* Tr. 580, 625). And Ms. Norris never initiated physical therapy treatment for back and hip pain despite multiple referrals and prompting from Dr. Syed. (Tr. 567, 681, 684, 810).

Last, the ALJ reviewed the state agency medical consultants' opinions and determined the limitations assessed on reconsideration were consistent with the evidence of low-back pain and vertigo. (Tr. 25). Ms. Norris does not contend the ALJ did not evaluate those opinions or improperly evaluated them; rather, she argues the ALJ's reliance on their opinions is not supported by substantial evidence because their specialties (surgery for Dr. Sreenivas (Tr. 101) and pulmonary medicine for Dr. Mutchler (Tr. 115)) are "far afield from the spine and balance conditions" at issue here (ECF #12 at PageID 859).

12

Ms. Norris does not cite any statute, regulation, or case law purporting to require that the state agency medical consultant assigned to review the claimant's applications must have specialized in areas that relate to the claimant's severe impairments. Rather, specialization is but one factor among several the ALJ considers when evaluating medical opinions. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5) (explaining that factors considered when reviewing medical opinions include supportability, consistency, relationship with the claimant, specialization, and other factors like the medical source's understanding of the disability program's policies and evidentiary requirements). While the ALJ must *consider* those factors, the ALJ need only *explain* how he considered supportability and consistency. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2) ("We may, but are not required to, explain how we considered the [relationship, specialization, and other factors], as appropriate."); *see also id.* §§ 404.1520c(b)(3), 416.920c(b)(3) (requiring the adjudicator to articulate how he considered the relationship, specialization, and other factors only when the adjudicator finds that two or more opinions about the same issue are both equally well-supported and consistent with the record but are not exactly the same). Moreover, a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to that area of specialty than the opinion of a medical source who is not a specialist. *Id.* §§ 404.1520c(c)(4), 416.920c(c)(4). But the regulations do not restrict a specialist from providing an opinion on matters unrelated to his specialty, so long as he is a licensed physician. *See id.* §§ 404.1502(a)(1), 404.1616(b), 416.902(a)(1), 416.1016(b). There are limited exceptions to this rule that do not apply here. For instance, a licensed podiatrist is an acceptable medical source and may opine on impairments of the foot and ankle only, and a qualified speech-language pathologist is an acceptable medical source and may opine on speech

13

and language impairments only. *Id.* §§ 404.1502(a)(4), (5); 416.902(a)(4), (5). Those licensed physicians specializing in surgery and pulmonary medicine, however, are not limited from providing opinions on impairments that fall outside of those specialties.

Finally, available case law suggests that it is not error to rely on a state agency medical consultant's opinion simply because the claimant's impairment falls outside the parameters of the consultant's specialty. For instance, in *Wolfenbarger o/b/o Wolfenbarger v. Saul*, No. 3:18-CV-326, 2019 WL 4738265 (E.D. Tenn. Sept. 27, 2019), the claimant alleged the ALJ erred in evaluating the state agency medical consultants' opinions because the consultants specialized in gynecology and cardiology, and those specialties were "inconsistent with [the claimant's] impairments." *Id.* at *10. The court acknowledged the consultants' specialties did not directly relate to the claimant's impairments but found no error because state agency consultants are "also qualified medical experts in the applicable disability regulations under the Social Security Act." *Id.* at *10.

Ultimately, the ALJ appropriately reviewed the medical evidence, Ms. Norris's reported symptoms, and the state agency opinions and determined the largely normal and mild findings associated with her impairments were accounted for by limiting her to light work with reduced postural activities and limitations as to hazards and noises. (Tr. 24-25). The ALJ then reasonably determined Ms. Norris's statements about her symptoms did not support greater limitations because she received routine, conservative treatment in the form of medication and did not pursue further treatment despite her continued reports of disabling symptoms. (Tr. 25). The ALJ's decision provides sufficient explanation for the RFC ultimately adopted. *See Brian B. v. Comm'r of Soc. Sec.*, 3:25-CV-187, 2026 WL 706584, at *15 (S.D. Ohio Mar. 13, 2026) (finding sufficient "logical bridge" where ALJ found greater limitations inconsistent with conservative treatment and

unwillingness to continue physical therapy); *Ouellette v. Comm'r of Soc. Sec.*, No. 1:25-CV-01841, 2026 WL 787991, at *5 (N.D. Ohio Mar. 20, 2026) (finding ALJ's explanation of mild findings on examination; conservative treatment; and lack of narcotic pain medication, assistive devices, and surgery sufficient to follow the ALJ's reasoning for the RFC). While Ms. Norris argues the evidence supported greater limitations—largely based on her reported pain and vertigo—the ALJ sufficiently explained his decision in a manner that allows this Court to track his reasoning and understand how he found Ms. Norris capable of performing light work. Accordingly, the ALJ's decision provides the requisite logical bridge between the evidence and the result.

CONCLUSION

After review of the record, the parties' arguments, and the law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: March 25, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE